**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
jbm@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JAMES SMITH**, and **TYLAR SPENCER**, on behalf of themselves and all others similarly situated, | Civil Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| **RPA ENERGY, INC.** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## TABLE OF CONTENTS

NATURE OF THE CASE ...................................................................................................1

PARTIES ...........................................................................................................................3

JURISDICTION AND VENUE .........................................................................................4

FACTUAL ALLEGATIONS .............................................................................................5

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets ................................5

    B.   Plaintiffs' Dealings With Green Choice .....................................................8

    C.   Green Choice's Unauthorized Pricing Practices ...................................9

    D.   Green Choice's Documented History Of Deceptive Business Practices .........................22

CLASS ACTION ALLEGATIONS .................................................................................23

CAUSES OF ACTION ....................................................................................................27

    COUNT I: BREACH OF CONTRACT ..................................................................27

    COUNT II: BREACH OF THE IMPLIED COVENANT
    OF GOOD FAITH AND FAIR DEALING ...........................................................28

    COUNT III: VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT.................30

    COUNT IV: VIOLATION OF MATERIALLY IDENTICAL
    STATE CONSUMER PROTECTION STATUTES............................................34

    COUNT V: VIOLATION OF NEW YORK GENERAL
    BUSINESS LAW § 349......................................................................................38

    COUNT VI: UNJUST ENRICHMENT .................................................................42

PRAYER FOR RELIEF ..................................................................................................43

JURY DEMAND ..............................................................................................................43

NOTICE TO ATTORNEY GENERAL AND OTHER
GOVERNMENT OFFICIALS .........................................................................................43

i

Plaintiffs James Smith and Tylar Spencer (collectively, "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacity, and on behalf of a class of customers defined below, against Defendant RPA Energy, Inc., d/b/a Green Choice Energy (hereinafter "Green Choice" or "Defendant") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.    This action seeks to redress Green Choice's deceptive and bad faith pricing practices that have caused thousands of commercial and residential customers in Michigan, Illinois, Ohio, Pennsylvania, Maryland, Delaware, and New Jersey to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.    Green Choice is an independent energy service company ("ESCO") that sells electricity and natural gas in deregulated energy markets across the United States.  Defendant has taken advantage of deregulation to exploit customers hoping to save on their energy costs.

3.    Green Choice represents in its customer contract that its variable energy rates are calculated and charged on a cost-plus basis.  For example, Green Choice's customer contract represents that the rate for natural gas will be "based on the wholesale cost of natural gas from the NYMEX exchange (including commodity, capacity, storage and balancing), transportation to the Delivery Point, plus all applicable taxes, fees, charges or other assessments and Green Choice Energy's costs, expenses and margins, plus a monthly administrative service fee of $5.00 per month."

4.    Similarly, Green Choice's customer contract represents that Green Choice's variable rate for electricity will reflect "the cost of electricity obtained from the PJM

Interconnection (including energy, capacity, prior period balancing, settlement, ancillaries), related transmission and distribution charges plus all applicable taxes, fees, charges or other assessments and Green Choice Energy's costs, expenses and margins, plus a monthly administrative service fee of $5.00 per month."

5.     Green Choice's representations in its form customer contract about its variable energy rates are false and deceptive, and designed to take advantage of customers' good faith and their lack of knowledge about, and access to, accurate wholesale and retail energy pricing and cost information.  In reality, Green Choice did not provide its customers with cost-plus rates derived from the components outlined in its contract, but rather used a pricing methodology that focused on maximizing profits while ignoring its contractual promise to base rates on documented and specified criteria.

6.     Further, to the extent Green Choice had any discretion in determining what specific and documented costs were properly categorized as inputs for its promised cost-plus pricing methodology, or how large of a margin it imposes, Green Choice did not exercise its discretion in good faith.  Instead, seeking to maximize profits, Green Choice set its variable energy rates with the aim of increasing profits at customers' expense and did not actually charge rates based on the cost-plus methodology outlined in its contract.

7.     As a result of Green Choice's unlawful acts described herein, thousands of unsuspecting customers have been, and continue to be, fleeced by Green Choice out of millions of dollars in exorbitant charges for electricity and natural gas.  Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

8.     Plaintiffs and other Green Choice customers (the "Class") have been injured by Defendant's unlawful practices.  Plaintiffs and the Class therefore seek damages, restitution,

statutory penalties, and declaratory and injunctive relief for Green Choice's breach of contract, breach of the duty of good faith and fair dealing, violation of state consumer protection statutes, and unjust enrichment.

9.     Only through a class action can Green Choice's customers remedy Defendant's ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Green Choice's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers do not realize they are victims of Green Choice's deceptive and unlawful conduct.  With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Green Choice engage in fair and upright business practices.

## **PARTIES**

10.     Plaintiffs reside in Detroit, Michigan.  Plaintiffs began receiving natural gas supply through Green Choice in the summer of 2021.  Green Choice charged Plaintiffs a fixed rate for natural gas until May 2022, after which it began charging them a variable rate.  Plaintiffs stopped receiving natural gas through Green Choice in January 2023.  Unbeknownst to Plaintiffs, Green Choice charged them excessive variable rates every month.

11.     As a result of Defendant's deceptive, unlawful, unauthorized, and otherwise improper conduct, Plaintiffs incurred excessive energy charges.

12.     Defendant RPA Energy, Inc. d/b/a Green Choice Energy is a Delaware corporation with its principal place of business in New York.  On information and belief, Green Choice has offices at 111 John St., Room 520, New York, NY 10038.

13.     Upon information and belief, all of Defendant's acts relevant to this litigation took place in New York: Green Choice processes all enrollment transactions and payments in New York; directs all marketing, billing, customer outreach, service, and tracking efforts from New York; develops, updates, and operates its website from New York, including all portions of its website that solicit customers; assesses and determines the rates charged to customers in New York, receives all payments from customers and maintains a bank account in New York; and drafts and disseminates its customer contract from New York.  Green Choice makes all of its major business decisions, including decisions regarding the marketing, contracting, pricing, and sale of Green Choice's electricity and natural gas supply services, from its New York offices.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

14.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

### Personal Jurisdiction

15.     This Court has General and Specific Personal Jurisdiction over Defendant because it is headquartered in this state, and it advertises, markets, distributes, and sells energy to New York customers.

### Venue

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District.  Further, venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of

the State in which the district is located."  28 U.S.C. § 1391(b)(1).  Green Choice is a corporation

that resides in New York, and for venue purposes it resides "in any district in [a] State within

which its contacts would be sufficient to subject it to personal jurisdiction if that district were a

separate State[.]"  *Id.* § 1391(d).  Here, Defendant's principal place of business is in the Southern

District of New York, and it maintains at least two offices in Manhattan.  Thus, Defendant

resides in this District and venue is proper in this District under § 1391(b)(1).

## FACTUAL ALLEGATIONS

**A.**   **The History Of Deregulation And ESCOs' Role In Energy Markets**

17.    In the 1990s and 2000s, numerous state legislatures and state regulatory agencies,

including the Michigan Public Service Commission ("MPSC"), deregulated the market for retail

energy supply.  Among the goals of deregulation was increased competition, with an eye towards

reducing energy rates customers and small businesses pay.  As a result, the natural gas and

electricity supply markets in Michigan, Illinois, Ohio, Pennsylvania, Maryland, Delaware, and

New Jersey are now open to competition, and customers and small businesses may choose their

energy supplier.

18.    ESCOs, the new energy suppliers, compete primarily against local utilities.

ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then

sell that energy to end-user customers.  However, ESCOs do not ***deliver*** energy to customers'

homes and businesses, and many do not produce electricity or extract natural gas.  Rather, the

companies that produce energy deliver it to customers' utilities, which in turn deliver it to the

customer.

19.    ESCOs like Green Choice merely buy electricity and natural gas and then sell that

energy to end-users with a mark-up.  Thus, ESCOs are essentially brokers and traders: they

neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell

it to customers with a mark-up.  The local utility also continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply.  The only value that ESCOs add in the energy supply markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge.  Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

20.     ESCOs are subject to minimal regulation by state utility regulators like the MPSC.  ESCOs like Green Choice do not have to file their rates with regulators or file the method by which those rates are set.  Instead, an ESCO customer's rates are governed by the ESCO's customer contract (and the relevant consumer protection and contract law).

21.     Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility.  For example, in Michigan, as in many states, the utilities charge energy supply rates that are driven by the same cost-factors set forth in Green Choice's customer contract.  Indeed, in Michigan, the MPSC sets the supply rate of the local utility, DTE Energy ("DTE"), based on DTE's costs and expenses to purchase and serve energy supply to its customers.[1]  DTE's supply rate includes both the wholesale cost of energy purchased on the competitive wholesale supply market, the cost to transmit that energy to the point of delivery where DTE acquires the energy from the transmission system, and DTE's documented overhead attributable to its acquisition of customers' energy supply.[2]  Other than

---

[1] *See* "Issue Brief: Rate Cases," MICH. PUB. SERV. COMM'N (Mar. 29, 2018), *available at* https://www.michigan.gov/-/media/Project/Websites/mpsc/consumer/info/briefs/Rate_Case_Issue_Brief_3-29-18.pdf?rev=8d07c00d17704d0a836e457779ba3cfe#:~:text=A%20rate%20case%20is%20conducted,the%20Michigan%20Administrative%20Hearing%20rules.

[2] *See, e.g.*, "Michigan natural gas rates," MICH. GAS UTILITIES, *available at* https://www.michigangasutilities.com/payment-bill/mi-rates (last visited Feb. 20, 2024).

Green Choice's "margins," mentioned in its customer contract, DTE's supply rate tracks the same factors as Green Choice's contract. The only meaningful difference in how DTE's monthly supply rate reflects DTE's costs for any given month is the fact that on an annual basis the MPSC compares the utility's actual supply costs for the prior year with the supply revenue collected from customers and considers any discrepancies when setting the next round of supply rates.[3] Over time, however, the peaks and valleys of the MPSC's adjustments—which again are directed at only the discrepancies in the utility's costs to supply energy versus the amounts the utility previously collected from customers for that supply—level out.

22.     By contrast, ESCOs such as Green Choice have more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers, such as by purchasing futures contracts for the delivery of electricity and gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce energy acquisition costs and pass those savings on to customers.

23.     Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Green Choice's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the cost-based factors set forth in Green Choice's contract; accordingly, no customer would ever agree to Green Choice's variable rate if they knew the truth.

---

[3] *Id.*

24.     The only way Green Choice can retain variable rate customers is by hiding the fact that rates are not based on Green Choice's documented supply, delivery, and overhead costs, but Green Choice's unbridled price gouging and profiteering.  Green Choice does not have discretion to "consider" the cost-plus formula set forth in its customer contract.  Green Choice is contractually bound to charge rates based on documented costs and expenses relevant to each monthly rate.

25.     That Green Choice's contract also includes Defendant's "margins" does not change this.  As a cost-plus contract where rates are "based on" or "reflect" specified procurement costs and fixed expenses (i.e. overhead), Green Choice is only permitted to charge a fixed margin.  Defendant did not specify a margin, so a reasonable margin will be supplied by the factfinder.  To the extent Green Choice claims it has discretion in setting rates (it does not), that discretion is cabined by the contract's explicit promise that the customer's rates will be "based on" or "reflect" Green Choice's wholesale procurement costs.   Any discretion Green Choice may have had—again, it did not—is also cabined by customers' reasonable expectations that Green Choice will not price gouge for the same energy sold by their local utilities.

26.     Green Choice took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates.  In theory, energy deregulation allows customers to shop for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline.  However, Green Choice exploits deregulated markets by consistently charging its customers far more than its contractual pricing term permits and failing to adequately disclose how its variable rates are actually determined.

**B.    Plaintiffs' Dealings With Green Choice**

27.     In the summer of 2021, a representative from Green Choice solicited Ms. Spencer, and she agreed to switch her gas supplier to Green Choice.  Ms. Spencer and Mr. Smith

are domestic partners, have shared a home for several years, and share their monthly energy

costs, including the Green Choice charges that are challenged in this litigation.   Further, a Green

Choice Energy training Manual and Code of Conduct Door-to-Door Sales Agents document

identifies which categories of individuals are "authorized" to enroll in Green Choice's supply

services in Illinois, Ohio, Pennsylvania, Maryland, Delaware, and New Jersey.  Other than

Delaware and Maryland, the spouse of the customer named on the utility account is authorized to

enroll.  In Illinois, Ohio, and Pennsylvania any individual over 18 years old and authorized to

make decisions concerning the utility account(s) can enroll.  Upon information and belief, under

Green Choice policies and practices applicable to Michigan customers Plaintiff Smith is

authorized to enroll and make decisions concerning Plaintiffs' utility account.

28.    Upon information and belief, as part of the sign-up process, Defendant provided

Plaintiffs with a copy of its standard, uniform contract.

29.    Green Choice began supplying natural gas to Plaintiffs' residence and it continued

to do so until January 2023.

30.    Green Choice began charging Plaintiffs a variable rate for natural gas in June

2022.

**C.    Green Choice's Unauthorized Pricing Practices**

31.    In its standard form contract, Green Choice represents to its customers that its

variable rate for natural gas will be "based on the wholesale cost of natural gas from the

NYMEX exchange (including commodity, capacity, storage and balancing), transportation to the

Delivery Point, plus all applicable taxes, fees, charges or other assessments and Green Choice

Energy's costs, expenses and margins, plus a monthly administrative service fee of $5.00 per

month."

32.     Similarly, Green Choice represents to its customers in its form contract that its variable rate for electricity will reflect "the cost of electricity obtained from the PJM Interconnection (including energy, capacity, prior period balancing, settlement, ancillaries), related transmission and distribution charges plus all applicable taxes, fees, charges or other assessments and Green Choice Energy's costs, expenses and margins, plus a monthly administrative service fee of $5.00 per month."

33.     Upon information and belief, Plaintiffs were subject to these or materially similar contractual terms for their variable rate for natural gas, which are substantially similar to the variable rate contractual terms for all of Green Choice's customers in the United States. Prior to filing suit, Plaintiffs contacted Green Choice's customer service department and requested a copy of the parties' signed contract but Green Choice did not respond.[4]

34.     The variable rate pricing structure outlined in Green Choice's contract has four components: (1) Green Choice's cost to procure energy from the wholesale market and the minor ancillary fees that accompany those supply costs; (2) the cost it takes to deliver the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system;[5] (3) "Green Choice Energy's costs" and "expenses," to cover Green

---

[4] Plaintiffs' counsel was able to locate the Green Choice form contract that was in use in Ohio on June 22, 2021, which is approximately the same time Plaintiffs enrolled with Green Choice in Michigan. That contract is attached as **Exhibit A.** The references herein to Green Choice's contract are to Green Choice's Ohio terms. With the aid of discovery, Plaintiffs will determine whether there are any material differences between the Ohio and Michigan contracts and reserve their right to amend their allegations to enforce any and all rights they have with respect to Green Choice's practices. Until that time, Green Choice's Ohio contract is an adequate proxy for its Michigan contract, as there is no meaningful difference in the Ohio and Michigan wholesale energy procurement and delivery process that would cause an ESCO like Green Choice to incur different categories of costs to serve customers in Michigan as versus Ohio. It is also a common practice for ESCOs to use the same variable rate pricing term in all of their contracts across the states in which they operate. That is because ESCOs typically set the variable rate for all customers in all states using the same process and considering the same factors.

[5] This cost is referenced in Green Choice's contract as "transportation to the Delivery Point" (for

Choice's modest and fixed overhead costs it incurs to supply customers' energy, and (4) Green Choice's fixed and consistent "margins" on those energy supply sales to customers.  In other words—and consistent with the fact that Green Choice is a middleman that purchases energy at wholesale and resells it with a markup—when Green Choice promises a rate "based on" or "reflecting" its wholesale procurement costs, plus delivery cost, its overhead, and margins, Green Choice in entering into a cost-plus contract with the following four specific inputs: (1) Green Choice's documented procurement costs, (2) the documented cost of delivery to the point of sale, (3) Green choice's documented overhead for supplying customers' energy, plus (4) a reasonable fixed margin.

35.    Considering Green Choice's representations in its customer contract about how variable rates are calculated and assessed, any reasonable consumer, including Plaintiffs, would reasonably expect that Green Choice's variable rates would "reflect" or be "based" on Green Choice's wholesale energy procurement costs.  Because Green Choice's overhead and margins are fixed, and transportation costs are relatively minor, the only factor that should cause the customer's rate to vary from month to month is Green Choice's cost to purchase its customers' energy supply at wholesale.   That is what the words "based on" and "reflect" in Green Choice's contract mean.  The contract does not give Green Choice discretion to set prices as it sees fit.  Instead, the contract restricts Green Choice's prices to the four components outlined therein.

36.    Unfortunately, Green Choice did not provide its customers with rates based on its wholesale costs.  Instead, Green Choice charged its customers variable rates that were untethered from its costs to maximize its own profits.

---

natural gas) and "related transmission and distribution charges" (for electricity).  Green Choice's contract states that the point of delivery is the location where the sale to the customer occurs.

37.     None of the other cost factors identified in Green Choice's customer contract explain its exorbitant charges.  For example, the costs of energy and related minor charges on the relevant wholesale market do not account for Green Choice's excessive rates.  As detailed below, Green Choice's rates far exceed those identifiable costs and thus do not "reflect" and are not "based on" those costs.

38.     Green Choice purchases its energy supply on the competitive wholesale market.  The cost of wholesale energy is overwhelmingly the largest cost Green Choice incurs.  The other cost factors outlined in the contract that comprise Green Choice's variable rate (such as gas-related costs like commodity, capacity, storage and balancing, and transportation to the Delivery Point) are minor and are also included in the supply rate charged by customers' local utility.  These additional costs are relatively insignificant in terms of the overall costs Defendant incurs to procure natural gas and electricity, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates.

39.     Therefore, Defendant's non-overhead cost factors cannot explain Green Choice's egregiously high variable rates or the reason its rates are disconnected from changes in wholesale supply costs.  Green Choice's overhead costs for supplying customers' energy (which are minor compared to its much larger supply costs) also do not explain the high variable rates charged.  Green Choice has modest and largely fixed overhead costs.  In fact, the local utility's rate also includes recovery of its overhead costs for supplying customers' energy, yet Green Choice's rates are far higher, reflecting Green Choice's unreasonable and excessive margins.

### Benchmark One: The Local Utility's Contemporaneous Supply Rate

40.     A comparison of available information on the cost of wholesale energy (Green Choice's primary cost to supply customers' energy, by far) shows that Green Choice does not

follow the pricing formula set forth in its contracts in good faith.  Publicly available data on the local utilities' rates, like DTE (the utility serving Plaintiffs' residence), serve as an ideal indicator of three of the four price components in Green Choice's customer contract: (1) the wholesale cost of energy, (2) the cost it takes to deliver the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and (3) "Green Choice Energy's costs" and "expenses," to cover Green Choice's modest and fixed overhead costs for supplying customers' energy.  This is because the utilities' energy procurement costs are the same costs ESCOs like Green Choice incur and the utility's rate is set by regulators to recover those procurement costs, the additional delivery costs, and the utility's supply overhead.  Not only are local utilities Green Choice's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost of supplying customers with energy.  Consequently, local utilities' supply rates are the ideal comparator for determining whether Green Choice's rates are "based on" or "reflect" the wholesale supply cost of energy.

41.     In fact, Defendant has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term.  After all, that was the purpose of deregulation.  Therefore, while Defendant's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate.  However, using the utility's rates as a benchmark for the contract's cost-plus pricing formula shows that Green Choice's rates were driven by excessive mark-ups and profiteering.

42.     The following table compares Plaintiffs' variable supply rates from Green Choice for eight billing periods to their local utility DTE's contemporaneous rates.

| Billing Period | Green Choice Rate ($/CCF) | DTE's Rate ($/CCF) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 5/28/2022–6/28/2022 | 1.12 | 0.425 | 2.64x | 164% |
| 6/29/2022–7/28/2022 | 1.281 | 0.428 | 2.99x | 199% |
| 7/29/2022–8/29/2022 | 1.281 | 0.392 | 3.27x | 227% |
| 8/30/2022–9/28/2022 | 1.281 | 0.507 | 2.53x | 153% |
| 9/29/2022–10/28/2022 | 1.281 | 0.523 | 2.45x | 145% |
| 10/29/2022–11/30/2022 | 1.281 | 0.507 | 2.53x | 153% |
| 12/1/2022–12/28/2022 | 1.147 | 0.507 | 2.26x | 126% |
| 12/29/2022–1/27/2023 | 1.048 | 0.482 | 2.17x | 117% |

43.    The "Overcharge Percentage" column demonstrates the drastic difference between Green Choice's rates for Plaintiffs' account and DTE's contemporaneous rates.  Green Choice's rates were more than double DTE's rates for each of the eight billing periods and its rate was more than **three times** DTE's rates in August 2022.  On average, Green Choice's rates were more than 2.5 times higher than DTE's rates.

44.    DTE's rates are a reasonable, pre-discovery benchmark of the cost-related factors in Green Choice's customer contract.  As explained above, DTE is Defendant's primary competitor in Plaintiffs' service territory, and its supply rates reflect the wholesale cost of energy, the cost it takes to deliver the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and the overhead costs the utility incurs in providing energy supply to Michigan customers (the same costs that ESCOs like Defendant incur), making the utility's rate an ideal stand in for a rate that is calculated based on the cost-factors in Green Choice's contract.

14

45.     The discrepancy between DTE's rates and Green Choice's rates is thus attributable to Green Choice's excessive and unreasonable varying "margin." Yet under Green Choice's contract, that margin must be both fixed and reasonable.

46.     Further, Defendant's contract with Plaintiffs does not allow it to include the price of obtaining renewable energy credits or carbon offsets for energy supply. Even if it did, however, the cost of obtaining said credits or offsets for one hundred percent of the energy it supplied to Plaintiffs and the Class is relatively small and does not account for Defendants' high rates. For example, the cost to purchase $CO_2$ offsets for one hundred percent of the natural gas Defendant supplied to Plaintiffs would have been only 5.5 cents per 100 cubic feet of natural gas ("CCF")—only 4% of Defendant's average rate. These costs do not explain Green Choice's exorbitant rates.

### Benchmark Two: Green Choice's Own Fixed Rates

47.     Green Choice's own fixed rates, which are significantly lower than its variable rates, demonstrate that Green Choice can cover both its supply and overhead costs and still make a reasonable profit. In fact, because Green Choice incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Green Choice to add *lower* margins to its variable rates. Yet the opposite is true.

48.     That Green Choice's variable rates were so much higher than its fixed rate and introductory variable prices demonstrates that Green Choice's rates did not comply with the contract's rate-setting formula. For example, in May of 2022 (when Green Choice began supplying Plaintiffs' natural gas), Green Choice charged Plaintiffs a variable rate of $1.12 per CCF. Yet at the same time Green Choice's 12-month fixed rate was $0.60 per CCF.[6]

---

[6] *See* "Residential Offers: DTE," Compare MIGas Offer Archives, MICH. PUB. SERV. COMM'N,

49.    There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Green Choice charges its fixed rate customers. Green Choice's costs for serving variable rate customers and fixed rate customers are not substantially different. In fact, Green Choice's costs for serving variable rate customers are likely lower than Green Choice's costs for supplying fixed rate energy. The only reason that Green Choice's variable rates are so much higher than its fixed rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices and transparent violation of its contract's cost-plus pricing term.

50.    Green Choice's rates also cannot be explained by the price of carbon offsets. As both variable rates and fixed rates offered by Green Choice are "100% matched" with carbon offsets, offset pricing does not explain the discrepancy between the two pricing plans.

### *Benchmark Three: Competitor ESCO Rates*

51.    Green Choice's egregious rate setting is made all the more obvious when compared to other ESCOs available to Michigan customers in the same region. Of the 16 ESCOs who provided services to Plaintiffs' region in January 2023, all but one offered far lower rates than Green Choice's.[7]

52.    Other ESCOs that include carbon offsets with their energy do not charge Green Choice's egregious markup. This is because the costs associated with purchasing carbon offsets are minimal compared to the cost of procuring natural gas at wholesale. For example, ESCOs

---

*available at* https://web.archive.org/web/20220521214719/https://gaschoice.apps.lara.state.mi.us/Choice/CurrentOffers?areaId=2&marketId=1 (last visited Feb. 20 2024).

[7] *See* "Residential Offers: Consumers Energy," Compare MIGas Offer Archives, MICH. PUB. SERV. COMM'N, *available at* https://www.michigan.gov/mpsc/-/media/Project/Websites/mpsc/consumer/nat-gas/comparemigas/2023/January-2023-Consumers-Energy-Residential-Compare-MI-Gas-Snapshot.pdf (last visited Feb. 20, 2024).

Ardent Energy and Provision Energy both provided variable rates of $0.59 per CCF and $0.70 per CCF, respectively, in January 2023, and they both also provide 100% carbon offsets.[8] Whereas, Green Choice's rate for a comparable product was $1.05 per CCF.[9]  All the ESCOs providing carbon offset energy reflected in this January 2023 data provided substantially lower rates than Green Choice.[10]

53.    Other than a desire to promote or use clean energy, price is the most important consideration for potential Green Choice customers.  Given that there is no other difference at all in the energy that ESCOs supply as opposed to the consumer's local utility, the only reason a consumer would switch to Green Choice is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility, plus a willingness to pay the costs of carbon offsets.

### *Benchmark Four: Market Supply Costs*

54.    A comparison of Green Choice's rates to prevailing market costs also demonstrates that Green Choice does not set rates in compliance with the contract's cost-plus formula.

55.    The table below, *see* ¶ 57, identifies (i) the billing periods during which Plaintiffs were enrolled in Green Choice's variable rate for gas services, (ii) the variable rate Green Choice charged Plaintiffs, (iii) the corresponding "Market Supply Costs," and (iv) the differences between Green Choice's rates and the contemporaneous Market Supply Costs.

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

56.     The Market Supply Costs below are based on the costs that an ESCO incurs supplying a retail customer for each billing period, including the cost to procure carbon offsets. The Market Supply Costs are based on the relevant City Gate prices for Plaintiffs' utility zone. The City Gate is the point of measuring station at which a distributing gas supplier receives gas from the pipeline or transmission system.  City Gate prices represent the total cost paid by gas supply companies (like the local utility or ESCOs like Green Choice) at the City Gate.  The City Gate price reflects all charges for the acquisition, storage, and transportation of gas as well as other charges incurred to obtain gas for sale to end-use customers like Plaintiffs.  In other words, the City Gate price corresponds to the first two of the four pricing components set forth in Green Choice's contract: (1) the wholesale cost of energy, and (2) the cost it takes to deliver the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system.

57.     The Market Supply Costs in the table below combine City Gate prices with the costs of carbon offsets, and thus represent the costs and charges that are relevant to the costs that Green Choice and other ESCOs incur in providing gas to retail customers.  Each of these measures reflects the costs that Green Choice's competitors, in the regulated or deregulated markets, incur.  That Green Choice's rates are so vastly different from the Market Supply Costs demonstrates that Green Choice's natural gas rates are not "based on the wholesale cost of natural gas from the NYMEX exchange (including commodity, capacity, storage and balancing), transportation to the Delivery Point" and Green Choice's fixed and modest overhead.

| Billing Period | Green Choice Rate ($/CCF) | Market Supply Costs ($/CCF) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 5/28/2022–6/28/2022 | 1.12 | 0.96 | 1.17x | 17% |
| 6/29/2022–7/28/2022 | 1.281 | 0.93 | 1.37x | 37% |

| 7/29/2022–8/29/2022 | 1.281 | 0.91 | 1.41x | 41% |
| 8/30/2022–9/28/2022 | 1.281 | 0.89 | 1.44x | 44% |
| 9/29/2022–10/28/2022 | 1.281 | 0.57 | 2.24x | 124% |
| 10/29/2022–11/30/2022 | 1.281 | 0.60 | 2.15x | 115% |
| 12/1/2022–12/28/2022 | 1.147 | 0.62 | 1.84x | 84% |
| 12/29/2022–1/27/2023 | 1.048 | 0.60 | 1.74x | 74% |

58.    Again, Green Choice's overhead is minimal compared to its wholesale procurement costs and the table above shows that it variable rates are consistently and substantially higher than a rate based on the wholesale cost of natural gas, the cost to transport it to the point of delivery, and the cost of offsets, which further demonstrates that Green Choice's rates are not set in accordance with its customer contract's specific cost-plus pricing formula.

59.    Green Choice's rates were higher than the Market Supply Costs for all provided months and were, on average, 67% higher than Market Supply Costs.

60.    Green Choice's rates also fail to fluctuate in accordance with Market Supply Costs.  For instance, when the Market Supply Costs steadily declined from $0.93 per CCF to $0.57 per CCF between June of 2022 and October of 2022, Green Choice's variable rate remained the same at over $1.28 per CCF.  That Green Choice's rates do not track the Market Supply Costs (which unlike the utility's rate are not set to account for discrepancies in the prior year but are instead reflective of contemporaneous supply rates) is further proof that Green Choice is not following the pricing formula its contract and is instead levying an excessive and unreasonable fluctuating margin.

61.    Defendant's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by

selling customers retail energy.  However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of energy in their respective markets and that Defendant's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead outrageously higher.

62.    No reasonable consumer who knew the truth about Green Choice's exorbitant rates would have chosen it as an energy supplier.

63.    Green Choice lulled customers into purchasing its energy supply via material misrepresentations and omissions about its variable energy rates.  Defendant did so to reap excessive profits at the expense of unsuspecting customers.  Defendant acted with actual malice or wanton and willful disregard for customers' well-being.

64.    In this case, Green Choice knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and would simply pay the exorbitant charges, month after month.

65.    It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[11] and "Nudges."[12]

66.    Defendant's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that customers will compare Green Choice's prices with what their local utility

---

[11] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[12] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.

67.     Green Choice did not adequately disclose to Plaintiffs that its variable energy rates are consistently and significantly higher than the rates customers' local utilities charge. Green Choice likewise failed to adequately disclose to Plaintiffs that in paying Defendant's variable energy rates, they received no added material benefit at a dramatically higher price than if they had bought their energy from their local utility.

68.     Green Choice knew that its variable rates were consistently and significantly higher than the local utility's rates.  In fact, a Green Choice Energy training Manual and Code of Conduct Door-to-Door Sales Agents admonishes New Jersey agents not to "[r]epresent that GREEN CHOICE offers competitive prices when such is not the case."

69.     Defendant's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

70.     Moreover, Defendant at no time alerted or informed Plaintiffs that the cost for energy would be continuously *significantly* higher than the same energy sold by their local utility.

71.     A reasonable consumer understands and expects that variable energy rates will reflect the wholesale price for the commodity, that is, the wholesale market price available to Green Choice for the energy it in turn supplies to its retail customers.

72.     However, Green Choice's variable rates are much higher than wholesale market price of energy in Michigan.

73.    Green Choice's omissions with respect to the rates it would charge were materially misleading.

74.    Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed customers and customers continued to pay, the continuing violation doctrine applies.

**D.    Green Choice's Documented History Of Deceptive Business Practices**

75.    Green Choice has a documented history of using unlawful and deceptive marketing and sales practices.  For example, in October 2023, the Public Utilities Commission of Ohio ("PUCO") concluded an investigation into Green Choice's practices.  The PUCO found that Green Choice's deceptive practices had so significantly violated Ohio's regulatory requirements that it rescinded Green Choice's certificates to provide both retail electric and natural gas service in Ohio.[13]   In other words, Ohio banned Green Choice from selling energy in that state's deregulated energy market.

76.    The PUCO found 144 separate violations and ordered Green Choice to pay a forfeiture of $1.44 million—amounting to $10,000 per violation.[14]

77.    Among other things, PUCO staff uncovered evidence that Green Choice "falsified enrollment contracts, charged unfair variable rates, and refused to cooperate with [the] investigation."[15]

---

[13] *In the Matter of the Commission's Investigation into RPA Energy, Inc.'s Compliance with the Ohio Administrative Code and Potential Remedial Actions for Non-Compliance*, Case No. 22-44-GE-COI (Pub. Util. Comm. Oh., Oct. 18, 2023), *available at* https://dis.puc.state.oh.us/ViewImage.aspx?CMID=A1001001A23J18B44908G02170.

[14] *Id.* ¶ 79.

[15] *Id.* ¶ 46.

78.    Finally, because "making customers who have been harmed by [Green Choice's] violations whole is of paramount importance,"[16] PUCO ordered Green Choice to "re-rate" the deceived customers "back to their respective utility's default service rate and send notice informing said customers that they will receive a refund of a specified amount."[17]  The PUCO's actions likewise demonstrate that the local utility rate is an appropriate benchmark for assessing Green Choice's compliance with the terms of its customer contract and the duty of good faith and fair dealing.

## CLASS ACTION ALLEGATIONS

79.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all residential and commercial customers in the United States who were charged a variable rate for electricity or natural gas services by Green Choice from the earliest allowable date through the date of judgment (the "Class").

80.    Plaintiffs also bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all Green Choice residential and commercial customers in the Michigan who were charged a variable rate for electricity or natural gas services by Green Choice from the earliest allowable date through the date of judgment (the "Michigan Subclass").

81.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing practices—and this case is about the

---

[16] *Id.* ¶ 80.

[17] *Id.* ¶ 82.

responsibility of Defendant for its knowledge and conduct. This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions. Upon information and belief, the variable rate provisions in the customer agreements for all of Green Choice's customers (the "Class Members") are materially the same.

82.    Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

83.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

84.    Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Green Choice. Plaintiffs believe, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Defendant's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

85.    The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

86.     Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendant.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

87.     Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs has retained competent and experienced class action attorneys to represent their interests and those of the Class.

88.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a.  Whether Defendant's misrepresentations and omissions are materially misleading;

b.  Whether Defendant breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

c.  Whether Defendant violated the duty of good faith and fair dealing in its customer contracts;

d.  Whether Defendant's conduct violates various state consumer protection and unfair competition statutes;

e.  Whether Defendant was unjustly enriched as a result of its conduct;

f.  Whether Class Members have been injured by Defendant's conduct;

g.  Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

h.  The extent of class-wide injury and the measure of damages for those injuries.

89.     A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

90.     A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

91.     A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

92.     Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

    a.  Whether Defendant's misrepresentations and omissions are materially misleading;

    b.  Whether Defendant breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    c.  Whether Defendant violated the duty of good faith and fair dealing in its customer contracts;

    d.  Whether Defendant's conduct violates various state consumer protection and unfair competition statutes;

    e.  Whether Defendant was unjustly enriched as a result of its conduct;

    f.  Whether Class Members have been injured by Defendant's conduct; and

g.  Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices.

93.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
**Breach Of Contract**
**(On Behalf Of The Class)**

94.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

95.    Green Choice customers have customer agreements whose variable rate terms are substantially similar.

96.    Plaintiffs and the Class entered into valid contracts with Defendant for the provision of natural gas.

97.    Green Choice represents to its customers that its variable rate for natural gas will be "based on the wholesale cost of natural gas from the NYMEX exchange (including commodity, capacity, storage and balancing), transportation to the Delivery Point, plus all applicable taxes, fees, charges or other assessments and Green Choice Energy's costs, expenses and margins, plus a monthly administrative service fee of $5.00 per month."

98.    Green Choice represents to its customers that its variable rate for electricity will reflect "the cost of electricity obtained from the PJM Interconnection (including energy, capacity, prior period balancing, settlement, ancillaries), related transmission and distribution charges plus all applicable taxes, fees, charges or other assessments and Green Choice Energy's costs, expenses and margins, plus a monthly administrative service fee of $5.00 per month."

99.     Upon information and belief, Plaintiffs were subject to the same contractual terms for their variable rate for natural gas, which is substantially similar to the variable rate contractual terms for all of Green Choice's customers in the United States.

100.     Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Defendant charged for natural gas and electricity.

101.     However, Defendant failed to perform its obligations under its contracts to charge rates based upon the cost-plus formula set forth in Defendant's contracts.  Instead, Defendant charged variable rates for natural gas and electricity that were untethered from the cost-factors upon which the parties agreed the rate would be based.

102.     Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Defendant based its rate on the cost-factors identified in the contract.

103.     By reason of the foregoing, Defendant is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

<u>**COUNT II**</u>
**In The Alternative, Breach Of The Implied Covenant Of Good Faith And Fair Dealing**
**(On Behalf Of The Class)**

104.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.     Plaintiffs and the Class contracted with Defendant for the provision of natural gas and electricity supply.

106.     Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and

may be breached even if there is no breach of the contract's express terms. This cause of action is pleaded in the alternative to Plaintiffs' contract claims.

107.    Under the contract, to the extent Defendant had discretion to set the variable rate for natural gas and electricity, it was obligated to exercise its discretion in good faith.  Defendant exercised its discretion in bad faith.  Specifically, Defendant acted with a bad motive and gouged customers.   Defendant has also known for years (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Defendant could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Defendant could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.  Despite this superior knowledge, Defendant acted with a bad motive and continued to gouge customers and small businesses.

108.    Defendant's failure to disclose the material information (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Defendant could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Defendant could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged  is what permitted Green Choice to charge Plaintiffs whatever it wanted—unburdened by disclosing the truth about its rate setting

practices—and Plaintiffs experienced the adverse consequences in the performance of the parties'
agreement.

109.    Plaintiffs reasonably expected that Green Choice's variable energy rates would not
be continuously and significantly higher than the utility's rates or other ESCOs' rates.  Without
these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy
energy from Defendant.

110.    Plaintiffs also reasonably expected that Defendant would refrain from price gouging.
Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed
to buy energy from Defendant.  Defendant knew it was engaging in price gouging and
nevertheless extracted unreasonable and excessive margins from its variable rate customers.

111.    Defendant breached the implied covenant of good faith and fair dealing by
unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other
Class Members' reasonable expectations that Defendant's variable energy rate would be
commensurate with Defendant's costs.

112.    As a result of Defendant's breaches, Green Choice is liable to Plaintiffs and
members of the Class for damages and attorney's fees and expenses.

## COUNT III
### Violation Of Michigan Consumer Protection Act
### (On Behalf Of The Michigan Subclass)

113.    Plaintiffs reallege and incorporate by reference each and every allegation contained
in the preceding paragraphs as if fully set forth herein.

114.    Plaintiffs bring this claim under M.C.L. § 445.903 on their own behalf and on
behalf of each member of the Michigan Subclass.

115.    Michigan's consumer protection statute states that "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful[.]" M.C.L. § 445.903.  Among the behaviors prohibited by M.C.L. §445.903 are:

  a.  Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.  *See* M.C.L. §445.903(s);

  b.  Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.  *See* M.C.L. §445.903(z);

  c.  Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.  *See* M.C.L. § 445.903(bb).

116.    Defendant's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

117.    Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of M.C.L. § 445.903, including:

  a.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

  b.  Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

  c.  Failing to provide customers adequate advance notice of the variable rates it would charge;

31

d.  Failing to adequately disclose the variable rate methodology Green Choice used to calculate its variable rates to enable customers to potentially compare prices;

e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

f.  Affirmatively misrepresenting the factors used to determine a customer's variable rate; and

g.  Charging its customers a price that is grossly in excess of the price at which natural gas and electricity are sold.

118.    The above deceptive practices and acts by Green Choice were material omissions of existing or past facts.

119.    Defendant knew or believed that the above unfair and deceptive practices and acts were material omissions.

120.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of Michigan, which aims to protect consumers.

121.    Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Green Choice.

122.    Each of Defendant's contracts include a multi-day rescissionary period.  During the rescissionary period, Defendant's contract serves as a solicitation because consumers may "cancel" the agreement before it becomes legally binding upon the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Defendant misrepresents that the variable energy rates will be based upon the costs and factors identified in the contract. Defendant also knew that its variable rate is not in fact based on its supply costs, overhead, and commercially reasonable margins.

123.     Defendant knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Green Choice.

124.     Defendant knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Green Choice was the customer's local utility.

125.     Defendant knew at the time it signed up Plaintiffs and prospective customers that Green Choice's marketing of variable rates was premised on offering customers a lower energy rate than the customer's local utility.

126.     Defendant knew at the time it signed up Plaintiffs and prospective customers that Green Choice's variable rates for electricity and gas were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

127.     Defendant's omission that Green Choice's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

128.     Defendant's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 117 above, Green Choice deprived customers of the ability to make informed purchasing decisions.

129.     Defendant's practices are unconscionable and outside the norm of reasonable business practices.

130.     As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Green Choice and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on the factors outlined in its contract, as well as the difference in Green Choice's variable rate and the default

rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Defendant. By reason of the foregoing, Defendant is liable to Plaintiffs and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

131.    Plaintiffs and the members of the Class further seek equitable relief against Defendant. Pursuant to M.C.L. § 445.903, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

132.    Pursuant to M.C.L. § 445.911(4), this Court has the power to award relief based on the actual damages caused by a method, act, or practice in trade or commerce defined as unlawful under this M.C.L. § 445.903.

133.    As a result of Defendant's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under the Michigan Consumer Protection Act.

## <u>COUNT IV</u>
**Violation Of Materially Identical State Consumer Protection Statutes**
**(On Behalf Of The Class)**

134.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

135.    Pursuant to the materially identical consumer protection statutes of Michigan, Illinois, Ohio, Pennsylvania, Maryland, Delaware, and New Jersey, consumers are protected

against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

136.    Green Choice violated at least the following materially identical statutes:

    a.    Michigan Consumer Protection Act, M.C.L. § 445.903;

    b.    Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2;

    c.    Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.02, .03;

    d.    Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4);

    e.    Delaware Consumer Fraud Act, 6 Del. C § 2513;

    f.    Maryland Consumer Protection Act, Md. Commercial Law Code Ann. § 13-303, *et seq.*; and

    g.    New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2.

137.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

138.    Defendant's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

139.    Defendant has engaged in, and continues to engage in, deceptive acts and practices,  including:

    a.    Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    b.    Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

c. Failing to provide customers adequate advance notice of the variable rates it would charge;

d. Failing to adequately disclose the variable rate methodology Green Choice used to calculate its variable rates to enable customers to potentially compare prices;

e. Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

f. Affirmatively misrepresenting the factors used to determine a customer's variable rate.

140. The above unfair and deceptive practices and acts by Green Choice were material omissions of existing or past facts.

141. Defendant knew or believed that the above unfair and deceptive practices and acts were material omissions.

142. The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

143. Defendant first made these mispresentations prior to the conclusion of the rescissionary period of the contract, during which Defendant's contract served as a solicitation. The agreement is not legally binding prior to the expiration of the rescissionary period. Thus, the contract is an advertisement in which Defendant misrepresents that the variable energy rates will be based upon the costs and factors identified in the contract. Defendant also knew that its variable rate is not in fact based on its supply costs, overhead, and commercially reasonable margins.

144. Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Green Choice.

145.    Defendant knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Green Choice.

146.    Defendant knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Green Choice was the customer's local utility.

147.    Defendant knew at the time it signed up Plaintiffs and prospective customers that Green Choice's marketing of variable rates was premised on offering customers a lower energy rate than the customer's local utility.

148.    Defendant knew at the time it signed up Plaintiffs and prospective customers that Green Choice's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

149.    Defendant's omission that Green Choice's variable rate for energy was consistently substantially higher than the local utility rate is material to prospective customers.

150.    Defendant's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 139 above, Green Choice deprived customers of the ability to make informed purchasing decisions.

151.    Defendant's practices are unconscionable and outside the norm of reasonable business practices.

152.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Green Choice and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on the factors outlined in its contract, as well as the difference in Green Choice's variable rate and the default

rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the

not been deceived into accepting energy supply from Defendant.  By reason of the foregoing,

Defendant is liable to Plaintiffs and Class Members for trebled compensatory damages,

attorneys' fees, and the costs of this suit.

153.    Plaintiffs and the members of the Class further seek equitable relief against

Defendant.  This Court has the power to award such relief, including but not limited to, an order

declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in

any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the

Class all amounts wrongfully assessed and/or collected.

154.    As a result of Defendant's deceptive acts or practices, Plaintiffs and Class

Members suffered actual damages in an amount to be determined at trial, and are entitled to their

damages, costs, and reasonable attorneys' fees and all other relief available under each state's

respective consumer protection statute.

### COUNT V
**In The Alternative, Violation Of New York General Business Law § 349**
**(On Behalf Of The Class)**

155.    Plaintiffs reallege and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

156.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349 on their own behalf

and on behalf of each member of the Class because a substantial part of the deceptive conduct

occurred in New York.

157.    Plaintiffs bring this claim in the alternative to their claims under the materially

identical consumer protection statutes of Michigan, Illinois, Ohio, Pennsylvania, Maryland,

Delaware, and New Jersey.  To the extent it is determined that the conduct challenged in this

litigation is falls within the territorial reach of N.Y. Gen. Bus. Law § 349, customers in Michigan,

Illinois, Ohio, Pennsylvania, Maryland, Delaware, and New Jersey can enforce N.Y. GEN. BUS.

LAW § 349.

158.    New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the

conduct of any business, trade or commerce or in the furnishing of any service in this state."

N.Y. Gen. Bus. Law § 349.

159.    Defendant's marketing and sales practices are consumer-oriented in that they are

directed at members of the consuming public.

160.    Defendant has engaged in, and continues to engage in, deceptive acts and practices

in violation of N.Y. Gen. Bus. Law § 349,  including:

   a.  Failing to adequately disclose that Defendant's variable energy rates are
       consistently and significantly higher than the rates the customer's
       existing utility charges;

   b.  Failing to adequately disclose that customers paying Defendant's
       variable energy rates receive no material added benefit in exchange for
       paying energy rates that are dramatically higher than the local utility's
       rates;

   c.  Failing to provide customers adequate advance notice of the variable
       rates it would charge;

   d.  Failing to adequately disclose the variable rate methodology Green
       Choice used to calculate its variable rates to enable customers to
       potentially compare prices;

   e.  Failing to adequately disclose the conditions that must be present for a
       variable rate customer to save money compared to what the consumer's
       local utility would have charged; and

   f.  Affirmatively misrepresenting the factors used to determine a
       customer's variable rate.

161.    The above deceptive practices and acts by Green Choice were material

misrepresentations or omissions of existing or past facts.

162.    Defendant knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

163.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

164.    Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Green Choice.

165.    Each of Defendant's contracts include a multi-day rescissionary period.  During the rescissionary period, Defendant's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Defendant misrepresents that the variable energy rates will be based upon the costs and factors identified.  Defendant also knew that its variable rate is not in fact based on its supply costs, overhead, and commercially reasonable margins.

166.    Green Choice knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Green Choice.

167.    Green Choice knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Green Choice was the customer's local utility.

168.    Green Choice knew at the time it signed up Plaintiffs and prospective customers that Green Choice's variable rates for electricity and natural gas were consistently and substantially higher than Plaintiffs' and prospective customers' local utility rate, a rate reflective of the factors set forth in Green Choice's contract.  Green Choice also knew that this information

was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

169.    Defendant's omission that Green Choice's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

170.    Green Choice knew at the time it signed up Plaintiffs and prospective customers that Green Choice had failed to disclose the actual methodology Green Choice used to calculate its variable rates in a way that would allow a reasonable person to potentially compare prices. Green Choice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

171.    Green Choice knew at the time it signed up Plaintiffs and prospective customers what conditions must be present for a Green Choice variable rate customer to save money compared to what the customer's local utility would have charged.  Green Choice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

172.    Defendant's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 160 above, Green Choice deprived customers of the ability to make informed purchasing decisions.

173.    Defendant's practices are unconscionable and outside the norm of reasonable business practices.

174.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiffs and Class Members switched to and remained with Green Choice and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate

41

they were charged versus the rate they would have been charged had Defendant charged a rate based on the factors outlined in its contract, as well as the difference in Green Choice's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Defendant.  By reason of the foregoing, Defendant is liable to Plaintiffs and Class Members for compensatory damage or statutory damages (whichever is greater), attorneys' fees, and the costs of this suit.

175.    Plaintiffs and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. Gen. Bus. Law § 349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

176.    As a result of Defendant's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349.

## COUNT VI
### In The Alternative, Unjust Enrichment
### (On Behalf Of The Class)

177.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs does not intend to proceed with their unjust enrichment claim.

179.    Plaintiffs and the Class Members conferred a tangible economic benefit upon Defendant by contracting with Defendant for electricity or natural gas.  Plaintiffs and the Class would not have contracted with Defendant for electricity and natural gas had they known that Defendant would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

180.    Plaintiffs and the Class Members would not have purchased energy from Defendant had they known the truth about Defendant's variable energy rates.

181.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

182.    It would be unjust and inequitable for Defendant to retain the payments Plaintiffs and Class Members made for excessive energy charges.

183.    Therefore, Defendant is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Defendant's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendant Green Choice has committed the violations of law alleged herein;

(c)    Render an award of  compensatory and statutory damages, the  precise amount  of which is to be determined  at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(e)    Render an award of  punitive damages;

(f)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)    Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

## NOTICE TO ATTORNEY GENERAL AND OTHER GOVERNMENT OFFICIALS

A copy of this Complaint will be electronically mailed to the Attorney General of the State of New Jersey within twenty-four hours of its filing, pursuant to N.J.S.A. § 56:8-20.

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois pursuant to 815 I.L.C.S § 505/10a(d).

Dated: February 20, 2024
New York, New York

                          **WITTELS MCINTURFF PALIKOVIC**

By:    *J. Burkett McInturff*
          J. Burkett McInturff
          305 BROADWAY, 7TH FLOOR
          NEW YORK, NEW YORK 10007
          Telephone: (914) 775-8862
          jbm@wittelslaw.com

          D. Greg Blankinship
          **FINKELSTEIN, BLANKINSHIP,**
          **FREI-PEARSON & GARBER, LLP**
          One North Broadway, Suite 900
          White Plains, New York 10601
          Telephone: (914) 298-3281
          gblankinship@fbfglaw.com

          *Attorneys for Plaintiffs and the Proposed Class*

44