UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES SMITH and TYLAR SPENCER, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     -v-<br><br>RPA ENERGY, INC., BRIAN TROMBINO, and ADAM BASHE,<br><br>          Defendants. | 24-cv-01254 (JSR)<br><br>MEMORANDUM ORDER |

JED S. RAKOFF, U.S.D.J.:

This is a putative consumer class action by two Michigan homeowners who entered into a contract with defendant RPA Energy, Inc. (also referred to as Green Choice Energy) to purchase energy. Defendants have filed a motion to compel arbitration based upon an arbitration provision allegedly agreed to by plaintiffs. Resolution of this motion to compel turns exclusively on the question of whether plaintiffs agreed to the arbitration provision (i.e., whether there was mutual assent). There is no dispute that plaintiffs did not have actual notice of the arbitration provision. Rather, defendants claim plaintiffs were on inquiry notice of the arbitration provision and are therefore bound by it. For the reasons set forth below, the Court agrees with defendants.

## I.  **Background**

Defendant RPA Energy, Inc. is an independent energy services company, with its principal place of business in New York, that sells

electricity and natural gas to customers in deregulated energy markets, including Michigan. Am. Compl. (Dkt. 8) ¶¶ 1-2, 12, 27. Co-defendant Brian Trombino is the CEO of RPA Energy and co-defendant Adam Bashe is the Chief Sales & Marking Officer for RPA Energy. *Id.* ¶¶ 28-29. The two named plaintiffs in this putative class action are a Michigan couple who jointly entered into a contract to purchase energy from RPA Energy. *Id.* ¶¶ 25, 46-47. In their complaint, plaintiffs allege that defendants engaged in deceptive and unlawful pricing practices by falsely representing how the prices actually charged are calculated. *See id.* ¶¶ 1-24. Plaintiffs seek to represent a nation-wide class of individuals who entered into variable rate energy contracts with RPA Energy, as well as a similar class of Michigan-only customers. *Id.* ¶¶ 97-110.

The below factual recitation is based upon the declarations defendants have submitted in support of their motion to compel arbitration. Except where specifically noted, defendants' declarations are not contradicted by plaintiffs.

Defendant RPA Energy employs door-to-door sales representatives to enroll new customers to its service. *See* Bashe Decl. (Dkt. 21) ¶ 3; TVP Decl. (Dkt. 20) ¶ 5. The sales representatives use a program called EZ TVP to complete the enrollment. *See* Bashe Decl. (Dkt. 21) ¶ 5; TVP Decl. (Dkt. 20) ¶ 6. To enroll a customer, the representative begins by filling out various customer information in the presence of the customer and then uses the EZ TVP program to send a link to the

customer via text message or email, in the form below. TVP Decl. (Dkt. 20) ¶¶ 7-8; Bashe Supp. Decl. (Dkt. 28) ¶ 6.



After clicking this link, the customer is then presented with the following prompt:

Bashe Supp. Decl. (Dkt. 28) ¶ 8; TVP Decl. (Dkt. 20) ¶ 9.

If the customer then hits "Yes" (thereby agreeing to the Privacy Policy, which is not in issue here), the screen then shows the full enrollment page, which includes the customer information already gathered by the sales representative, in the following format:



Please review the following and provide your signature below:

Welcome to TPV.com! The purpose of this tool is to confirm your authorization to switch to Green Choice Energy for electricity and/or gas supply services, to verify the details of the contract, and to prevent fraud. Information gathered by this tool is covered by our Privacy Policy.

[ NO | YES ]  I Understand and Agree to the Privacy Policy

### Customer Summary



Account #1

**Authorizing Name:** Sammi Test
**Billing Name:** Sammi Test
**Billing Telephone Number:** ▇▇▇▇
**Email Address:** ▇▇▇▇@answernet.com
**Service Address:**
    123 EASY STREET APT # 2
    AVOCA, MI 48006
**Utility:** DTE Energy
**Fuel type:** Natural Gas
**Account Number** : 111111111111
**Rate Type:** Variable
**Rate Amount** : Variable
**Term:** Month to Month

### Preview your contract(s):

[ Prepare preview contract(s) ]

### Rescission:

You will have the right to rescind your acceptance of this agreement without fees or penalties of any kind within 3 business days from receiving the Disclosures and Terms and Conditions.



[ NO | YES ]  I understand and agree to the information above.

[ Click to add Signature ] ✔

[ Continue ]

Bashe Supp. Decl. (Dkt. 28) ¶ 10.

The customer then scrolls past the "Customer Summary" summarizing the basic price terms and then proceeds to the "Preview your contract(s)" header -- where the customer can (but is not required to) press the button to see the entire terms of the proposed contract. The customer then proceeds to the "Recission" button where, if the customer wants to proceed further, he needs to hit "Yes" indicating his agreement to the recission terms. Bashe Supp. Decl. (Dkt. 28) ¶ 10. Once this is completed, a customer completes their enrollment by clicking the "Click to add Signature" button, inputting their electronic signature, and then pressing "Continue," at which point the customer receives an "executed contract, containing the Terms and Conditions, via a hyperlink text as a text message and/or email." TVP Decl. (Dkt. 20) ¶ 16.

As noted above, a customer is not required in order to complete enrollment to press the "Prepare preview contract(s)" button appearing under the heading "Preview your contract(s)," although a customer is required to scroll past the button if the customer wants to enroll. *See* Bashe Supp. Decl. (Dkt. 28) ¶ 10. However, if a customer does press the "Prepare preview contract(s)" button, the customer is then taken to another page that displays the entire agreement, omitting only the customer's signature, which is added at the end of the registration process. *See* TVP Decl. (Dkt. 20) ¶ 12. In any case, no agreement is entered into unless the customer hits "Click to add Signature," then signs, and then hits "Continue," at which time the

customer gets a copy of the signed agreement including the customer's signature.

On the fifth page of the six-page agreement is the following arbitration clause (in solid capital letters):

16. Waiver of Jury Trial. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING CLAIMS ARISING IN CONTRACT, TORT, STATUTORY OR OTHERWISE, SHALL BE SETTLED EXCLUSIVELY AND FINALLY BY ARBITRATION IN ACCORDANCE WITH THE RULES AND PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION. ANY ARBITRATION PROCEEDING HEREUNDER SHALL BE CONDUCTED EXCLUSIVELY IN MICHIGAN. NEITHER PARTY MAY ALTER, AMEND, OR OTHERWISE CHANGE THE BINDING OBLIGATION TO ARBITRATE DISPUTES SET FORTH IN THIS PROVISION WITHOUT THE EXPRESS CONSENT OF THE OTHER PARTY. BY ENTERING INTO THIS AGREEMENT, CUSTOMER AGREES TO BINDING ARBITRATION AND WILL NOT PURSUE ANY FURTHER ACTION IN A COURT OF LAW. CUSTOMER WILL NOT HAVE THE RIGHT TO

PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION.

Bashe Decl. Ex. A (Dkt. 21-1), at 5.

One of the two named plaintiffs, Tylar Spencer, submitted a declaration in support of plaintiffs' opposition to the instant motion. In it, Spencer concedes that she encountered a door-to-door salesman from defendants, "reviewed information on a mobile device and signed [her] name electronically on the mobile device." Spencer Decl. (Dkt. 26) ¶¶ 2-3. However, Spencer also claims she "did not sign on the page [of the contract] that [defendant] says has my signature," "did not see that page" before signing, and did not "see any 'fine print' terms,

including the 'Terms of Service' in what [defendant] claims is my contract." *Id.* ¶¶ 3-4. The "page that [defendants] say[] has [plaintiff's] signature" (but that plaintiff disputes seeing) is at the end of the full version of the contract that, according to defendant, was sent to plaintiff after she completed the registration process. *See* Bashe Decl. (Dkt. 20) ¶ 9 & Ex. A; TVP Decl. (Dkt. 20) ¶ 12. The declaration also offers the conclusory assertions that "I did not and do not agree to the 'Terms of Service'" and "I did not and do not agree to arbitrate my claims against [defendants]." Spencer Decl. (Dkt. 26) ¶¶ 5-6.

## II. **Discussion**

### A. **Legal Standard**

"Courts deciding motions to compel arbitration apply a standard similar to that applicable for a motion for summary judgment." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) (internal quotation marks omitted). "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the Court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks omitted). "If, however, there is [a genuine] issue of fact as to the making of the agreement for arbitration, then . . . a trial is necessary." *Zachman*, 49 F.4th at 101; *see* 9 U.S.C. § 4 ("If the making of the arbitration agreement .

. . be in issue, the court shall proceed summarily to the trial thereof.").

In deciding whether to grant a motion to compel arbitration, the court must determine (1) "[w]hether the parties agreed to arbitrate," and (2) "whether the claims fall within the scope of the arbitration agreement." *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 399 (S.D.N.Y. 2018). Here, plaintiffs do not contest their claims fall within the scope of the arbitration provision, and so the instant motion turns exclusively on whether the parties entered into a valid agreement to arbitrate.

The question of whether an agreement to arbitrate exists "is determined by state contract law." *Meyer*, 868 F.3d at 73-74. Under Michigan law, which the parties agree applies here, *see* Defs. Mot. to Compel (Dkt. 19) at 10; Pls. Opp. (Dkt. 25) at 7 n.6, contract formation requires five elements: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v. Cannon Twp.*, 265 Mich. App. 582, 592 (2005). Plaintiffs challenge only the fourth of these requirements, that the parties mutually agreed to be bound. *See* Pls. Opp. (Dkt. 25) at 8 n.7.

Mutuality of agreement "is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kloian v. Domino's Pizza, L.L.C.*, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006). "Michigan law presumes that one who signs a written agreement knows the nature of the instrument

so executed and understands its contents." *Watts v. Polaczyk*, 619 N.W.2d 714, 717 (Mich. Ct. App. 2000) ("[M]ere failure to read an agreement is not a defense in an action to enforce the terms of a written agreement."). "[U]nder Michigan law, electronic signatures have the same legal effect as handwritten ones." *Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 705 (6th Cir. 2016).

The Michigan Supreme Court has not had occasion to address the question of contract formation in the context of digital consumer contracts. However, a substantial body of state and federal case law has developed on the subject, and the parties briefing assumes that the Michigan Supreme Court would follow this precedent. Given the apparent uniformity of this non-Michigan precedent, the Court adopts the same assumption. *See* Restatement of the Law, Consumer Contracts (Tentative Draft No. 2) § 2 Reporters' Notes (June 2022) (noting that "State and Federal court decisions have converged on [the same] minimum requirements [for digital consumer contract formation], with almost no exception.").

Under this precedent, even where a user does not have actual notice of a contract term, the term may nevertheless be enforceable as long as the user is placed on inquiry notice of the term and engages in some conduct that can reasonably be construed as assenting to it. *See Lee v. Panera Bread Co.*, 2023 WL 2606611, at *4 (E.D. Mich. Mar. 6, 2023), report and recommendation adopted, 2023 WL 2603934 (E.D. Mich. Mar. 22, 2023); *Shirley v. Rocket Mortg.*, 2022 WL 2541123, at *5 (E.D. Mich. July 7, 2022). Courts have converged on two minimum

requirements to establish that a user is bound based upon this theory: "(1) a reasonably prudent person would be on inquiry notice of the terms [seeking to be enforced] and (2) the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (internal quotation marks omitted).

Cases applying this standard frequently distinguish between so-called "clickwrap" and "browsewrap" agreements. "A clickwrap agreement is one that 'require[s] the user to manifest assent to the terms [contained on a website] by clicking on an icon.'" *Johnson v. Best Buy Co., Inc.*, 2024 WL 1228760, at *2 n.1 (Mich. Ct. App. Mar. 21, 2024) (quoting *Traton News, LLC v. Traton Corp.*, 528 F. Appx. 525, 526 n.1 (6th Cir. 2013)). Because a user is required to scroll past the proposed terms and affirmatively manifest assent, "clickwrap agreements . . . have routinely been upheld," including by Michigan courts. *Id.* (internal quotation marks omitted) (enforcing arbitration agreement against employee where employee clicked "I agree" in filling out employment application); *see, e.g.*, *Tariq v. Tenet Healthcare Corp.*, 2022 WL 880629, at *2, 4-5 (Mich. Ct. App. Mar. 24, 2022) (finding arbitration agreement valid and enforceable when plaintiff clicked "I agree" after the agreement "popped up" on plaintiff's computer screen at the conclusion of a training video).

A "browsewrap" agreement, by contrast, "discloses terms on a website that offers a product or service to the user, and the user assents by visiting the website to purchase the product or enroll in

the service." *Lee*, 2023 WL 2606611, at *3 (quotation omitted). Courts are more hesitant to enforce browsewrap agreements but will still do so as long as "the hyperlink to the terms and conditions is conspicuous enough to place the user on inquiry notice." *Id.* at *4 (quotation omitted); *see, e.g., In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 882 (6th Cir. 2021) (concluding, under Michigan law, plaintiffs were bound by amendment to terms of service that were sent to them and that stated "[i]f you do not agree to these Terms, do not use any portion of the Services")

Between these two poles are so-called "modified clickwrap" agreements, such as the one here, where "the customer must take affirmative action -- pressing a 'click' button -- but, like a browsewrap agreement, the terms being accepted do not appear on the same screen as the accept button" and a user is not necessarily required to scroll past them. *Lee*, 2023 WL 2606611, at *3 (quoting V*ernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012)). As with a browsewrap agreement, the ultimate enforceability of such agreements turns on application of the two-part test described above.

### B. Application

Plaintiffs argue that neither the reasonable notice nor unambiguous assent prong is satisfied here. In the alternative, plaintiffs argue that, at a minimum, there is a genuine dispute of fact as to whether either prong is satisfied in light of the denials in the Spencer declaration. Each argument is addressed in turn.

1. <u>Reasonable Notice</u>

The first prong asks whether a reasonably prudent user in plaintiffs' position would be on inquiry notice of the arbitration provision. "A reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way." *Edmundson*, 85 F.4th at 704. The fact that the provision sought to be enforced was "available only by hyperlink" to another page, as was the case here, "does not preclude a determination of reasonable notice . . . [a]s long as the hyperlinked text was itself reasonably conspicuous." *Meyer*, 868 F.3d at 78-79; *see Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent."). However, "when terms are linked in obscure sections of a webpage that users are unlikely to see, courts will refuse to find constructive notice." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016).

Here, a would-be customer who wanted to view the full Terms of Service (that contained the arbitration provision) before agreeing to the contract had the opportunity to click the green "Prepare preview contract(s)" button (displayed below), which would then show the full six-page contract, including the arbitration provision, in solid capitals, on the fifth page. But while a user had to scroll past this button in order to complete her enrollment, she was not required to

actually click the button or view the full Terms of Service. *See* Bashe
Supp. Decl. (Dkt. 28) ¶ 10.

```
┌─────────────────────────────────────────────────────────────┐
│                                                               │
│   Preview your contract(s):                                   │
│   ┌─────────────────────────────┐                             │
│   │ Prepare preview contract(s) │                             │
│   └─────────────────────────────┘                             │
│                                                               │
└─────────────────────────────────────────────────────────────┘
```

    Plaintiffs argue that it was not sufficiently clear the "Prepare
preview contract(s)" button was, in fact, a hyperlink that would take
the user to the prepared contract. Pls. Opp. (Dkt. 25) at 13-14.
Plaintiffs point to various features of this button that supposedly
made it unclear that it was a hyperlink including the fact that it
does not use blue/underlined text as is supposedly typical and that
it does not use "rounded corners, shadow or ways of creating depth
(akin to a physical button), or even a contrast outline." *Id.* Plaintiff
also argues that this "is the smallest font on the page" and suggests
it is not clearly visible. Pls. Sur-Reply (Dkt. 30) at 3-5.

    Plaintiffs' argument lacks merit. Courts recognize that "a
reasonably prudent smartphone user knows that text that is highlighted
in blue and underlined is hyperlinked to another webpage where
additional information will be found." *Meyer*, 868 F.3d at 77-78. While
the hyperlink here was not "blue and underlined," but instead was
contained in a green button, that hardly matters. The button here was
bright green in an otherwise white page without any clutter, and the
user was required to scroll past the button to finalize registration.
*See id.* at 78 (relying on fact of "uncluttered" page with only a
handful of fields to conclude link to terms of service was sufficiently

prominent). Moreover, directly above the button are the words (in large print) "Preview your contract(s)" followed by a colon, making clear that pressing the button will show the customer the proposed terms of "your" (i.e. the customer's) contract. That this was a pressable button is also confirmed by the two other blue buttons on the same page -- one to "Click to add signature" and the other to "Continue" to the next page -- that are of a similar shape and size as the "Prepare preview contract(s)" button, and plaintiff admittedly clicked on these buttons because she was required to do so to progress through the enrollment process. A reasonable user therefore would have known that the "Prepare preview contract(s)" was a pressable button, and that it would have taken her to the draft contract.

Plaintiffs also briefly argue that, even if the link to the terms was clear, the arbitration clause itself was not. *See* Pls. Opp. (Dkt. 25) at 19-20. But in fact the document containing the arbitration provision was not particularly long, only six pages, and the arbitration provision appeared on the fifth page in all capital font. This is not a case where an arbitration provision was buried deep within a hundred-page contract. Accordingly, the Court concludes that plaintiffs were indisputably on inquiry notice of the arbitration provision.

### 2. Unambiguous Assent

The second prong of the test asks whether a user engaged in conduct that unambiguously manifested assent to the contractual provision. "[W]here an internet or smartphone user does not explicitly

say 'I agree' to the [specific] contractual terms, a court must determine whether a reasonably prudent user would understand his or her conduct to constitute assent to those terms." *Edmundson*, 85 F.4th at 704; *see* Restatement of the Law, Consumer Contracts (Tentative Draft No. 2) § 2 cmt. 1 (June 2022) ("Adoption of standard contract terms is a separate legal consequence from the formation of a binding contract. A contract is formed when the parties manifest assent to a contractual relationship. When the contract is formed, standard contract terms may be adopted as part of the contract if the business can demonstrate that [the requirements of reasonable notice and assent] are met."). In making this determination, courts have considered such factors as "(1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms; (2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at time  when the consumer would expect to receive such terms; and (3) the course of dealing between the parties." *Edmundson*, 85 F.4th at 704-05 (internal quotation marks and citations omitted).

Here, plaintiff Spencer, who enrolled on behalf of both plaintiffs, plainly manifested her assent to the terms during the enrollment process. Most clearly, the message first sending the link to begin enrollment stated, "Your Contract with Green Energy is ready to sign." Bashe Supp. Decl. (Dkt. 28) ¶ 10. After being given explicit opportunity to review the contract and its terms, she then went ahead and signed. This by itself was sufficient to bind her to its terms.

15

Plaintiffs try to avoid the above conclusion by noting that the signature button immediately follows the "Recission" heading, so that the signature arguably only refers to the rescissory terms seen below:



But this argument is untenable. The "Recission" section, which is separated from the rest of the page by grey lines above and below, has its own separate agreement button that required the user to indicate agreement by hitting "Yes" before proceeding further, so no reasonable user could believe that the large "Click to add Signature" button referred to anything but the overall contract.

Moreover, once a user clicked the signature button, she then had to add her electronic signature after which she would receive the full contract with the signature added. The Court concludes as a matter of law that in affixing her electronic signature in this manner, a reasonable consumer would have understood that she was assenting to the terms of the contract. Indeed, a reasonable person, even one uneducated in the law, understands that the traditional way to accept

16

a contract and its terms is by signing. *See Watts v. Polaczyk*, 619 N.W.2d 714, 717 (Mich. Ct. App. 2000) ("Michigan law presumes that one who signs a written agreement knows the nature of the instrument so executed and understands its contents."). That a contract was being entered into is confirmed by the broader context of the transaction. The link that was sent to plaintiff Spencer that took her to the enrollment portal was accompanied by the text "Your Contract with Green Choice Energy is ready to sign." Bashe Supp. Decl. (Dkt. 28) ¶ 6. Once in the portal, Spencer was presented with a header that said, "Please review the following and provide your signature below," followed by a two-sentence paragraph that informed her that the "purpose of this tool is," among other things, "to verify the details of the contract." Id. ¶ 8. Thus, a reasonable user would have entered the portal with the expectation they would be presented with a contract to sign.

Of course, the fact that a reasonable user would expect that she would be signing some contract does not necessarily mean that she understood the arbitration provision would be a part of that contract. As plaintiffs point out, there is no language next to the "Click to add Signature" button that specifies that in adding one's electronic signature, one specifically agreed to the arbitration provision.

The Court finds this point unpersuasive. As noted above, the phrases "Preview your contract" and "Prepare preview contract(s)" clearly indicate that there are specific contract terms being proposed and a reasonable user would have been on notice of these terms.

Further, the use of the word "your" in this phrase clearly implies that what is being proposed is not a generic set of terms, but rather the terms that would actually govern the transaction for that particular customer. Upon reviewing the Terms of Service, a reasonable user would have understood them to be part of the contract.

The "transactional context of the parties' dealings reinforces [the] conclusion" that a reasonable user would have understood these more specific terms to be incorporated. *Mayer*, 868 F.3d at 80. This is not a circumstance where a customer was simply clicking through a website without any expectation that her actions would result in a binding agreement. Instead, the user, after live discussions with the company's representative, entered the portal with the expectation she would be signing a commercial contract to purchase energy. Upon actually being presented with the option to preview these more specific contract provisions, a reasonable user would have understood them to be the actual contract terms governing the party's relationship. *Cf. id.* (relying on the fact that "[t]he registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions," to conclude user unambiguously manifested assent); *Edmundson*, 85 F.4th at 708 ("When [plaintiff] arrived at the [payment interface], she knew well that purchasing the GameStop item with [plaintiff] meant that she was entering into a continuing relationship with [defendant]" . . . The [payment interface] provided clear notice that there were terms that would govern this continuing relationship. A reasonable internet

user, therefore, would understand that finalizing the GameStop transaction, entering into a forward-looking relationship with [defendant], and receiving the benefit of [defendant's] service would constitute assent to those terms.").

As a fallback, plaintiffs argue that the document that appears when the user presses "Prepare preview contract(s)" is still ambiguous. *See* Pls. Opp. (Dkt. 25) at 23-25. The first and second pages of that document -- titled "Variable Price Contract Summary" and "Variable Price Contract," respectively -- summarizing certain high-level information about the terms of the agreement. *See* Bashe Decl. Ex. A (Dkt. 21-1) at 1-2. At the bottom of the first page, it states, "For additional information, please refer to your Terms and Conditions." *Id.* at 1. The third through sixth pages of the document -- titled "Variable Price Contract Terms of Service" -- contain the actual, specific contractual terms governing the sale of energy, including the arbitration provision. *Id.* at 3-6. Plaintiff argues the jumble of different headers, and the reference to "Terms and Conditions" on the first page, rather than "Terms of Service," collectively make it unclear whether the user was actually agreeing to the last four pages.

While this contract may have been inartfully drafted, when taken in its broader context the Court finds its import to be unambiguous. As an initial matter, the very fact that the user is taken to this document only after clicking "Prepare preview contract(s)" suggests that the entire document is the contract they would be entering into. The last four pages are titled "Variable Price <u>Contract</u> Terms of

Service," *id.* at 3 (emphasis added), confirming this is part of the contract. And the very nature of the specific information in the last four pages makes clear that it is the terms governing the sale of energy. For example, paragraph 1 states "Subject to the terms and conditions of this Agreement, Green Choice Energy agrees to sell and deliver, and Customer agrees to purchase and accept the quantity of natural gas as necessary to meet Customer's requirements . . . ." *Id.* at 3. Accordingly, the Court finds that, by adding her electronic signature through the portal, Spencer unambiguously assented to the arbitration provision.

### C. **Spencer Declaration**

Plaintiffs finally argue that, at a minimum, there are questions of fact that preclude granting defendants' motion. Plaintiffs point to Spencer's declaration, in which she "unequivocally denies that she signed or agreed to an arbitration agreement." Pls. Opp. (Dkt. 25) at 22-23. Spencer's declaration, in its entirety, reads as follows:

> "1. I am a Plaintiff in this case, and I have personal knowledge of the facts in this statement.
>
> 2. In the summer of 2021, I was approached by a salesperson for Green Choice Energy, which I now understand is another name for RPA Energy, Inc.
>
> 3. While speaking with the salesperson, I reviewed information on a mobile device and signed my name electronically on the mobile device. I did not sign on the page that Green Choice says has my signature. See ECF No. 21-1 at 2.
>
> 4. Before I signed, I did not see that page, nor did I see any 'fine print' terms, including the 'Terms of Service' in what Green Choice claims is my contract. See ECF No. 21-1

at 3-6. I also did not see anything that mentioned arbitration.

5. I did not and do not agree to the 'Terms of Service.'

6. I did not and do not agree to arbitrate my claims against Green Choice."

Spencer Decl. (Dkt. 26).

This declaration does not create a genuine dispute of material fact sufficient to defeat defendants' motion. The fact that Spencer did not have actual notice of the arbitration provision, *id.* ¶¶ 3-4, is irrelevant insofar as she was on inquiry notice of that term. Whether she was on inquiry notice is judged by an objective standard, and so her claim she did not have actual notice is at most relevant but is certainly not dispositive. *See Kloian*, 733 N.W.2d at 771 (noting that mutuality of agreement "is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind"). Nor is the conclusory assertion that Spencer did not agree to the Terms of Service or arbitration clause particularly relevant, given that contract formation is judged by an objective standard. *See* Spencer Decl. (Dkt. 26) ¶¶ 5-6.

Spencer's claim that she "did not sign on the page that [defendant] says has [her] signature" is similarly insufficient. *Id.* ¶ 3. The "page" Spencer is referring to is the final version of the Terms of Service that contains her signature. *See* Bashe Decl. Ex. A (Dkt. 21-1). Spencer does not contest that she did "sign[] [her] name electronically" while completing her enrollment, but only that she did not sign on the final contract itself. Spencer Decl. (Dkt. 26) ¶ 3.

21

But the fact Spencer was not looking at the final contract at the time she signed is irrelevant, because she was given an opportunity to review its terms prior to signing and was sent an executed copy of the contract via hyperlink shortly after completing her enrollment. *See* TVP Decl. (Dkt. 20) ¶ 16; Bashe Decl. (Dkt. 21) ¶¶ 12-13. Spencer's declaration is thus entirely consistent with defendants' theory of assent.

### III.   Conclusion

For the forgoing reasons, defendants' motion to compel arbitration (Dkt. 18) is granted. This case is hereby stayed and placed on the suspense calendar pending resolution of the arbitration. *See* 9 U.S.C. § 3.

SO ORDERED.

New York, NY
April **3ᴅ**, 2024

JED S. RAKOFF, U.S.D.J.